UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOSHUA JONES | * | CIVIL ACTION NO. 22-443 |
| | * | |
| VERSUS | * | SECTION: "G"(1) |
| | * | |
| KILOLO KIJAKAZI, ACTING | * | JUDGE NANNETTE JOLIVETTE BROWN |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

REPORT AND RECOMMENDATION

The plaintiff, Joshua Jones, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 423, 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 14) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 18 ) be GRANTED.

## **Procedural Background**

Mr. Jones applied for SSI and DIB on October 1, 2019, asserting a disability onset date of February 22, 2018. He alleged the following illnesses, injuries, or conditions:  cervical and lumbar regions, disc herniation bulging and derangement L4-5, L5-S1, C5-6, C7, blurring vision, diabetes, neuropathy, broken great toe on the right, high blood pressure, high cholesterol.  On March 12, 2020, his claims were denied by the state agency. He requested reconsideration, and his requests were denied on November 10, 2020.

1

Mr. Jones obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 5, 2021. At the hearing, he amended the alleged disability onset date to December 10, 2019. On October 2, 2021, the ALJ issued an adverse decision. Mr. Jones timely appealed to the Appeals Council, which denied review on January 4, 2022.

On February 21, 2022, Mr. Jones filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record on July 8, 2022. (Rec. Docs. 10, 11). The parties filed cross-motions for summary judgment. (Rec. Docs. 14, 18). Mr. Jones is represented by counsel.

**Evidence in the Record**

*1.  Hearing before the ALJ and Mr. Jones' Function Reports*

Mr. Jones completed a Function Report in support of his application for benefits on December 26, 2019. R. at 308. He reported that his back, neck, and leg are always aching. R. at 302. He reported taking pain pills all day. R. at 301. He reported that he does not do any household chores because of his neck and back. R. at 303. He reported being able to walk for 10 minutes before needing to rest for 20 minutes. R. at 306. He reported trouble lifting, squatting, bending, standing, walking, kneeling, hearing, stair climbing, seeing, with memory, understanding, and following instructions. Id.  He did not report trouble reaching or sitting. Id.

A hearing was conducted before the ALJ on August 5, 2021. R. at 33. Mr. Jones explained that he cannot work because he has serious pain at levels of 8 or 9 in his neck and back. R. at 51. He takes pain pills, gets injections, and does physical therapy. Id.  At the time of the hearing he was attending physical therapy twice a week. R. at 52. He is waiting to find insurance that will allow him to get surgery. R. at 51. When he sits, he has to constantly rotate left or right to find a comfortable position because of his spine. Id.  He gets stiff and achy and has to get up and walk

around and then sit down again. R. at 61. Mr. Jones said that sitting is worse for him than standing. Id.

Mr. Jones also has neuropathy in his feet. R. at 52. He has special shoes that he wears daily, but usually he has to take them off and recline his feet because his leg swells up. R. at 52-53. Thus, he does not wear them all day. R. at 53.

He described his daily routine as getting up and trying to move around a lot. R. at 54. With regard to personal hygiene, he noted that his wife helps him put his shoes and socks on. R. at 55. She also helps him shave while he sits in a chair because he cannot stand in front of the mirror for that long. Id. If his wife or stepdaughter washes the clothes, he can sit on the sofa for a while and fold them. R. at 56. He has someone come to the house to cut the grass. Id.  He does not cook. Id.

Mr. Jones testified that he cannot do things like he used to. R. at 54. He used to take long walks in the park with his wife. Id.  He is limited because of the medication; he said he is always sleeping sometimes. Id.

Mr. Jones also has pain in his shoulder. R. at 56. He had surgery on his left shoulder and he cannot lift it past his head or even at his eye level. Id. He also has trouble holding anything with his left arm because he does not have strength like he used to. R. at 57.

Mr. Jones cannot squat or touch his toes. R. at 59. He can turn his neck halfway to the left and then to the right. R. at 59. When he tries to lift his head straight up, he can feel the bone on bone in his neck and it "just shoots from the neck all the way down the spine." Id.

Vocational expert Cindy Harris testified at the hearing. R. at 63. She classified Mr. Jones' past work as heavy truck driver, DOT Code 905.663-014, medium exertion level, with a semi-skilled SVP of 4 combined with a household appliance installer DOT Code 827.661-010, heavy exertion level, with a skilled SVP of 6. R. at 54. She also classified another position consisting of

collector, DOT Code 241.367-010, light exertion level, with a semi-skilled SVP of 4 combined with re-possessor DOT code 241.367-022, medium exertion level, with a semi-skilled SVP of 3. Id. She classified all remaining past positions as DOT job title heavy truck driver, 905.663-014, medium exertion, semi-skilled with SVP of 4. Id.

The ALJ asked the vocational expert to consider a hypothetical individual with the same age, education, and work history as Mr. Jones who can perform the full range of light work, except that he can only stand and/or walk for a total of four hours in an eight-hour workday; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch, crawl, and balance when walking on narrow, slippery, or uneven surfaces; can occasionally reach overhead and occasionally handle, finger, and feel with a non-dominant left upper extremity. R. at 64-65. The vocational expert testified that such a person would be unable to perform Mr. Jones' past work. R. at 65-66. However, the person could perform the following jobs: information clerk, DOT 237.367-018, light, unskilled, with SVP of 2, with 60,000 jobs in the United States; officer helper, DOT 239.567-010, light, unskilled with an SVP of 2, and with 80,000 positions in the United States; and furniture rental clerk, DOT 295.357-018, light, unskilled with an SVP of 2 and with 29,000 positions in the United States. R. at 66. The vocational expert added that the DOT does not distinguish between reaching, handling, fingering, and feeling with a dominant or non-dominant arm, but based upon the vocational expert's knowledge of how these positions are performed, they could be performed with the "occasional" limitation described in the hypothetical. Id. The vocational expert noted that she reduced the total number of jobs available to account for the additional limitations in the hypothetical. R. at 67. The vocational expert also testified that adding the additional limitation that the individual had to avoid pulmonary irritants such as noxious fumes, gas, or dust, would not alter the prior opinion, nor would a limitation that

when the person was required to sit up, he would need to stand at his workstation for approximately one minute every thirty minutes. Id. But if the individual were off task 15% of the workday, that would preclude work. R. at 67-68.

In response to questioning by Mr. Jones' attorney, the vocational expert testified that if the hypothetical person was limited to standing and/or walking two to three hours of the workday, they could not perform the previously listed jobs. R. at 72. Additionally, if the individual was limited to lifting and carrying 10 pounds, he would not be able to do the listed jobs. R. at 74. Finally, if the person had to miss all or part of a workday to receive medical treatment 38 times over 20 months in addition to ordinary absences, that person would not be able to sustain the jobs identified. Id.

    2. *Medical Records*

Although Mr. Jones amended his alleged disability onset date to December 10, 2019, the Court summarizes a few of his pre-onset medical records from 2017 through 2019 to provide some background and context. Mr. Jones suffered a workplace injury on March 3, 2017, when a delivery truck sliding door fell on his left big toe. R. at 249. The toe became infected, he was put on IV antibiotics for at least six weeks, and continued to suffer swelling and pain. R. at 242-47; 249-57.

The pre-onset date records also show that Mr. Jones was in a motor vehicle accident in early August 2017, resulting in neck and back pain. R. at 435.  Mr. Jones began treating with Dr. Troy Beaucoudray on February 21, 2018, with complaints of neck pain, mid and low back pain, and headaches. R. at 578. Dr. Beaucoudray noted that Mr. Jones' MRI in January 2018 documented a herniated disc at C6/C7. Id. At an appointment in May 2018, Dr. Beaucoudray noted that an EMG nerve conduction study of the bilateral upper extremities in May 2018 documented mild

diffuse sensory motor polyneuropathy consistent with his history of type 2 diabetes mellitus and coexisting left C6, C7 radiculopathy. R. at 646.

Mr. Jones began treating at the Pain Intervention Center on June 13, 2018. R. at 360-61. Records from his initial evaluation note that an MRI of the lumbar spine dated April 2, 2018, revealed broad-based posterior protrusion-subligamentous disc herniation at L4-L5 and L5-S1. R. at 375. An MRI of the cervical spine dated January 4, 2018, revealed a posterior bulging disc at C3-C4 and a posterior protrusion-subligamentous disc herniation at C6-C7. R. at 376.

Mr. Jones was examined by Dr. Peter Liechty on December 4, 2018, during the course of litigation related to the August 2017 car accident. R. at 411. Dr. Liechty recommended a C5-6, C6-7, anterior cervical discectomy and fusion and an L4-5, L5-S1 minimally invasive fusion. R. at 412. It does not appear that this surgery was ever performed.

Mr. Jones presented to the New Orleans Hospital East on December 10, 2019, with left sided neck and shoulder pain after jerking his steering wheel while driving to avoid getting hit by flying debris. R. at 540. He reported the pain was moderate to severe. Id. He exhibited tenderness in the left shoulder and cervical back, but normal range of motion. R. at 541. An x-ray of the shoulder revealed no evidence of acute osseous process. R. at 542. He was treated with a prescription for naproxen and Robaxin and instructed to follow up with his primary care practitioner. R. at 542.

On December 17, 2019, Mr. Jones presented to the Marillac Community Health Center for tetanus and hepatitis A vaccinations. R. at 656. He reported he had an upcoming trip to Puerto Rico to assist with disaster relief. Id.

On January 25, 2020, Mr. Jones returned to Dr. Beaucoudray. R. at 697. He reported that he was injured on December 9, 2019, when metal rods fell from the open tailgate of a pickup truck

and struck his car and he swerved to try and avoid them. Id.  He reported that he began to note left shoulder pain and increased neck and back pain. Id. He reported that he had started therapy with a chiropractor and that he had noted improvement in his neck and back but had continued with left shoulder pain, including increased pain with overhead reaching. Id. He described the shoulder pain as 9 of 10, aching, throbbing, and burning. Id.  His low back pain was 8 of 10 and his neck pain was 7 of 10. Id.  He noted he had recently started vacation time from work to further address these ongoing issues. Id.  Upon physical examination, he had 5/5 motor strength in the bilateral upper and lower extremities, moderate tenderness to palpation in the bilateral cervical and lumbar paraspinals with spasm noted, restricted range of motion on extension of the cervical and lumbar spine, tenderness to palpation over the anterior deltoid musculature of the left shoulder with pain on end range of motion with abduction and forward flexion. R. at 698. He was alert and oriented with normal mood and affect. Id.  His gait was antalgic with no ataxia and no unsteadiness. Id.  Dr. Beaucoudray recommended an MRI of the left shoulder. R. at 699. His Norco prescription was decreased to be more consistent with his actual utilization, and he was continued on Zanaflex and ibuprofen. Id.

A consultative examination was performed by Dr. Michael Day on February 26, 2020. R. at 663. He reviewed Mr. Jones' November 25, 2019, neurological assessment showing cervical radiculopathy, lumbar radiculopathy, and mild fascial pain. Id.  He also reviewed notes of Mr. Jones' April 2018 MRI showing lumbar spine disc herniation at L4-L5 with neuroforaminal stenosis and an MRI of his cervical spine showing C6-C7 disc herniation. Id.  He also reviewed notes of Mr. Jones' orthopedic surgeon on December 24, 2018, recommending an anterior cervical disc fusion and a minimally invasive fusion at L4-L5, L5-S1. Id. Mr. Jones reported he could feed, bathe, toilet, dress and transfer, and handle his basic hygiene needs with no assistance. R. at 664.

Due to back and neck pain, he requires additional time to perform yard work, housework, shopping, and cooking. Id.  Upon examination, Dr. Day observed a mild limp on the left side and noted that Mr. Jones has difficulty tandem walking. R. at 666. Mr. Jones could not hop, bend, or squat due to low back and left leg pain. Id.  A straight leg test was performed and positive supine on the left 0-80 degrees was noted. Id.  No muscle spasm was observed. Id.  His motor function was 4/5 on the left upper and lower extremities and 5/5 on the right. Id.  Pain in the cervical and lumbar paraspinal muscles was noted. Id.  Grip strength of 4/5 on the left with some decreased dexterity on the left was noted. Id.  Right handed grip strength was 5/5. Id.  Decreased range of motion in the neck and back was noted. Id.  Dr. Day opined that Mr. Jones can stand or walk between two and four hours with frequent rest periods due to his lower extremity radicular symptoms. R. at 667-68. He opined that Mr. Jones can sit for unlimited duration, lift up to 10 pounds occasionally and frequently, and can occasionally climb, balance, stoop, kneel, crouch, and crawl. R. at 668. He opined that Mr. Jones can only occasionally reach, handle, finger, and feel with his left hand. Id.  He opined that Mr. Jones should not work at heights or around extreme temperatures, dust, fumes, and gasses. Id.

Mr. Jones followed up with Dr. Beaucoudray on April 30, 2020, with ongoing pain complaints. R. at 693. It was noted that results of MRIs of the shoulder and lumbar and cervical spine in April 2020 showed a SLAP tear and rotator cuff tendinopathy on the left shoulder, central disc herniation and facet arthrosis at C6-7 resulting in spinal stenosis and moderate bilateral neural foraminal stenosis, broad-based posterior disc herniations and annular fissure/tears as well as minor to moderate bilateral facet arthrosis at L4-L5 and L5-S1 resulting in moderate central spinal stenosis, bilateral subarticular canal stenosis, and moderately severe bilateral neural foraminal stenosis at L5-S1 with displacement of the right and left S1 nerve roots and compression of the

existing left L5 nerve rood as well as moderate central spinal stenosis and canal stenosis with moderately severe bilateral neural foraminal stenosis at L4-L5 contacting the right and left L5 nerve roots and the exiting right L4 nerve root. Id.  He continued to report exacerbated neck and low back pain as well as left shoulder pain. Id.  He admitted to numb tingling pain radiating down mainly the left leg as well as both arms. Id.  His physical examination was the same as his previous visit. R. at 694-95. A C7/T1 epidural steroid injection, an L5/S1 epidural steroid injection, and a trigger point injection was performed. R. at 695. He did not appear interested in decreasing his controlled pain medication and pursuing a more interventional treatment approach. R. at 696. He was instructed to use Norco sparingly to wean off the medication. Id.  His Zanaflex and ibuprofen prescriptions were continued. Id.

On May 14, 2020, Mr. Jones was evaluated by Dr. David Wyatt and PA Kenneth Dunaway at the Orthopaedic Care Center of Louisiana. R. at 671-73. Mr. Jones reported neck pain of 8.5/10, lower back pain of 9/10, and left shoulder pain of 8.5/10. R. at 671. Mr. Jones noted he was "in telecommunications." Id.  He denied depression, mood swings, or nervousness. R. at 672. He was alert and oriented with a normal mood and affect. Id.  There was pain in the cervical spine on flexion and extension, as well as side-to-side bending. Id.  Similarly, there was pain on flexion and extension as well as side-to-side bending of the lumbar spine. Id.  A positive straight leg raise test on the left was noted. Id.  Motor and sensation were intact in all extremities. Id.  Dr. Wyatt opined that it was more likely than not that the December 2019 car accident aggravated his neck and back and likely caused his shoulder injury. Id.

Dr. Beaucoudray performed a lumbar intralaminar epidural steroid injection on June 11, 2020. R. at 691. Also on June 11, 2020, Mr. Jones returned to see Dr. Wyatt. R. at 674. He reported neck and back pain of 9/10 and left shoulder pain of 9/10. Id.  It was noted that an MRI documented

a superior labrum and posterior tear, rotator cuff tendinopathy, and some osteoarthritis of acromioclavicular joint. Id.

Surgery for left shoulder impingement syndrome was performed at Omega Hospital on June 29, 2020. R. at 777. Mr. Jones followed up with Dr. Wyatt on July 9, 2020, following his left shoulder scope subacromial decompression distal clavicle resection. R. at 675. He was doing well and had much better range of motion already. Id. Dr. Wyatt gave him some exercises to do at home for range of motion and strengthening. Id.

Mr. Jones returned to Dr. Wyatt on August 6, 2020. R. at 676. He reported neck pain of 9/10, lower back pain of 8/10, and shoulder pain of 7/10. Id. He was still doing home therapy and had not started physical therapy. Id. Dr. Wyatt refilled his medication and noted that he really wanted Mr. Jones to begin physical therapy for the shoulder. Id.

Mr. Jones followed up with Dr. Wyatt on September 10, 2020. R. at 677. He reported continued 8/10 neck and low back pain with left shoulder pain. Id. He had not started physical therapy. Id. Dr. Wyatt recommended physical therapy, and a C6-7 L4-5 epidural steroid injection. Id. He refilled Mr. Jones' medications. Id.

Mr. Jones attended physical therapy with the Metropolitan Health Group from October 1, 2020, through July 21, 2021. R. at 703-04; 779. At his initial evaluation, he reported constant pain of 10/10 in his neck and back, and pain of 10/10 in his left shoulder off and on. R. at 735. He was observed to have a functional gait without an assistive device. Id. He was tender to palpation at C5/6/7 and L3/4/5. R. at 736. He had minimally limited range of motion in his cervical spine, lumbar spine, and left shoulder. Id. His straight leg raise test was negative bilaterally. R. at 737.

On October 22, 2020, Mr. Jones presented to the Orthopedic Care Center and reported neck and upper back pain of 9 out 10, lower back pain of 8 out of 10, and left shoulder pain of 9 out of 10. R. at 725. He also reported tingling in his shoulder. Id.

At his November 2, 2020, physical therapy appointment, Mr. Jones reported neck, back, and left shoulder pain of 9/10 that occurred off and on. R. at 741. He had increased functional independence and improved activity tolerance. R. at 742. However, he was not at his prior level of function. Id.

At his November 24, 2020, physical therapy appointment, Mr. Jones reported neck, back, and left shoulder pain of 8/10 that occurred off and on. R. at 745. He reported no limitations putting on deodorant, lifting a glass to take a drink, or retrieving a gallon of milk from the refrigerator. R. at 746. He reported no limitations lifting his foot to tie his shoes, or negotiating stairs. Id. Although he still experienced pain, range of motion of his cervical and lumbar spine was within functional limits. Id. Range of motion of the shoulder was within normal limits. Id. Increased functional independence and improved activity tolerance was noted. R. at 747. But he was not at his prior level of function. Id.

At his December 22, 2020, physical therapy appointment, Mr. Jones reported neck, back, and left shoulder pain of 9/10 that occurred off and on. R. at 749. His gait was functional without an assistive device. Id. Range of motion in his cervical spine, lumbar spine, and shoulder were within functional limits though he still experienced pain. R. ta 750.

During a January 14, 2021, appointment at the Orthopedic Care Center, good range of motion for the left shoulder was noted. R. at 722. He reported his neck, lower back, and left shoulder pain were 9 out of 10. Id. He reported that medication and physical therapy were helping. Id.

At his January 22, 2021, physical therapy appointment, Mr. Jones reported constant neck, back, and left shoulder pain of 7 to 8 out of 10. R. at 753. His gait was functional without an assistive device. Id.  Range of motion of his cervical spine and lumbar spine were within functional limits. R. at 754. He still experienced pain on the left side. Id.  Range of motion in his shoulder was within normal limits, but painful at the end of range on abduction of the left. R. at 754. Strength of the upper and lower extremities was within normal limits bilaterally. R. at 754-55. Increased functional independence and improved activity tolerance was noted, though he was not at his prior level of function. R. at 755.

At his February 25, 2021, appointment at the Orthopedic Care Center, he reported neck and left shoulder pain of 8 out of 10 and lower back pain of 9 out of 10. R. at 723. He reported tingling in his left leg. Id.  He reported that his medication and physical therapy were helping. Id.

At his February 25, 2021, physical therapy appointment, Mr. Jones reported neck, back, and left shoulder pain of 8 out of 10 that occurred on and off. R. at 757. He presented with a functional gait without an assistive device. Id. He had minimal to moderate limitations in range of motion of the cervical and lumbar spine with pain. R. at 758. Range of motion of his left shoulder was also limited. Id.

At his March 25, 2021, physical therapy appointment, Mr. Jones reported constant neck, back, and left shoulder pain of 9/10. R. at 761. His gait was functional without an assistive device. Id. He had minimal to moderate limitation in range of motion of the lumbar and cervical spine, with pain. R. at 762. Range of motion of his left shoulder was also limited, but improved from the previous test. Id.

On April 15, 2021, Mr. Jones returned to the Orthopedic Care Center. R. at 724. He reported neck and lower back pain of 9 out of 10. Id.  He reported left shoulder pain of 9 of 10, but

only when reaching overhead. Id.  He reported tingling in his left leg. Id.  He reported physical therapy and medication were helping. Id.

At his April 30, 2021, physical therapy appointment, Mr. Jones reported constant neck, back, and left shoulder pain. R. at 765. He presented with a functional gait without an assistive device. Id. He had minimal to moderate limitation of range of motion in the cervical and lumbar spine. R. at 766. Range of motion of the left shoulder was also limited. Id.

### Decision of the Administrative Law Judge

The ALJ determined that Mr. Jones met the insured status requirements of the Act through December 31, 2021. The ALJ found that Mr. Jones has not engaged in substantial gainful activity since December 10, 2019—the amended alleged onset date. The ALJ found Mr. Jones has the following severe impairments: degenerative disc disease of the cervical and lumbar spine with radiculopathy, diabetes mellitus with neuropathy, and left shoulder SLAP tear and tendinopathy.

The ALJ next determined that Mr. Jones does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In making this determination, the ALJ considering listings 1.15, 1.16, and 1.18 as in effect at the time of the hearing and the ALJ's decision. Of relevance to the present appeal, the ALJ found that Mr. Jones did not meet listing 1.15 because there is no evidence to support the medical necessity of a hand-held assistive device nor an inability to use both upper extremities. The ALJ further found that no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment.

The ALJ next determined that Mr. Jones has the residual functional capacity to perform light work, except that he can only stand or walk four hours in an eight-hour work day; cannot climb ladders, ropes, or scaffolds; can only occasionally climb ramps or stairs; can only

occasionally stop, kneel, crouch, crawl, or balance when walking on narrow, slippery, or uneven surfaces; can only occasionally reach overhead, handle, finger, or feel with the non-dominant left upper extremity; and must avoid exposure to workplace hazards such as unprotected heights and dangerous moving machinery.

The ALJ found that Mr. Jones is unable to perform any of his past relevant work. The ALJ found that Mr. Jones has at least a high school education and was a younger individual aged 18-49 on the alleged disability onset date. Considering Mr. Jones' age, education, work experience and residual functional capacity, the ALJ found that there are jobs that exist in significant numbers in the national economy that Mr. Jones can perform. Therefore, the ALJ concluded that Mr. Jones has not been under a disability as defined in the Act from December 10, 2019, through the date of the ALJ's decision on October 6, 2021.

## Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ erred in applying the listing issued in December 2020 that purports to apply to claims pending on or after April 2, 2021, instead of the listing in effect at the time he applied for benefits.

Issue No. 2.    Whether the ALJ improperly failed to consider the effect of Mr. Jones' medical treatment on his ability to sustain gainful employment.

## Analysis

### I.  Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).  This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    **Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether

15

the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

### III.    Plaintiff's Appeal.

*Issue No. 1.    Whether the ALJ erred in applying the listing issued in December 2020 that purports to apply to claims pending on or after April 2, 2021, instead of the listing in effect at the time he applied for benefits.*

Mr. Jones argues that the application of the new Listing 1.15, instead of Listing 1.04, which was in effect at the time Mr. Jones submitted his application and at the time of the initial and reconsideration decisions, violates the 14th Amendment of the United States Constitution. He argues he was denied due process and that the application of the new regulation to his application violates the equal protection clause of the Constitution.  He insists that the evidence demonstrates that he meets the old Listing 1.04. Even if he does not meet the requirements of the old Listing 1.04, he argues that his impairments are at least equal in severity to Listing 1.04 and also new Listing 1.15.

The Commissioner opposes, arguing that application of the revised Listings to pending cases is not impermissibly retroactive. She argues that applying for benefits does not create a vested right to have particular rules apply. She argues further that requiring the SSA to apply the Listings in effect at the time of application would complicate the adjudication of Social Security

claims, would result in the SSA applying outdated criteria, and would work to the detriment of some claimants.

In reply, Mr. Jones complains that the Commissioner has failed to address his equal protection clause argument. He submits that the Commissioner relies on decisions from outside the Fifth Circuit and fails to address the Supreme Court's test for constitutionality. He insists that retroactive legislation must be supported by a legitimate legislative purpose furthered by rational means.

Appendix 1 of the applicable regulations, known as the "Listings," describe each impairment that the commissioner considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). The claimant "has the burden of establishing that his impairment meets or equals the criteria for presumptive disability described in the listings." Whitehead v. Colvin, 820 F.3d 776, 781 (5th Cir. 2016).

The facts here are not in dispute. On December 3, 2020, the Commissioner announced the issuance of final rules that would be "effective April 2, 2021," and that "[w]hen the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules, *and to claims that are pending on or after the effective date*." Revised Medical Criteria for Evaluating Musculoskeletal Disorders, 85 FR 78164-01 (emphasis added). The Commissioner also noted that "[t]hese final rules will remain in effect for 5 years after the date they become effective, unless we extend them, or revise and issue them again. We will continue to monitor these rules to ensure that they continue to meet program purposes, and may revise them before the end of the 5-year period if warranted." Id. At the time, Listing 1.04 provided:

> 1.04  Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral

17

fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanies by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

. . . .

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (2020). The introduction to Appendix 1 in effect at the time

of Mr. Jones' initial application noted that the Musculoskeletal System Listings "will no longer be

effective" on January 27, 2020, "unless extended by the Commissioner or revised and promulgated

again." 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2019).

The new Listing 1.15 provides:

1.15 Disorders of the skeletal spine resulting in compromise of a nerve root(s) (see 1.00F), documented by A, B, C, and D:

A. Neuro-anatomic (radicular) distribution of one or more of the following symptoms consistent with compromise of the affected nerve root(s):

    1. Pain; or
    2. Paresthesia; or
    3. Muscle fatigue.

AND

B. Radicular distribution of neurological signs present during physical examination (see 1.00C2) or on a diagnostic test (see 1.00C3) and evidenced by 1, 2, and either 3 or 4:

    1. Muscle weakness; and
    2. Sign(s) of nerve root irritation, tension, or compression, consistent with compromise of the affected nerve root (see 1.00F2); and
    3. Sensory changes evidenced by:
        a. Decreased sensation; or
        b. Sensory nerve deficit (abnormal sensory nerve latency) on electrodiagnostic testing; or
    4. Decreased deep tendon reflexes.

AND

C. Findings on imaging (see 1.00C3) consistent with compromise of a nerve root(s) in the cervical or lumbosacral spine.

AND

D. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:

> 1. A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or
> 2. An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)); or
> 3. An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (2022). Following the instructions of the Commissioner, the ALJ applied new Listing 1.15 and found that the listing had not been met because there was no evidence to support the medical necessity of a hand-held assistive device nor an inability to use both upper extremities. R. at 18. The ALJ did not address whether subparts A, B, and C of Listing 1.15 had been satisfied. Mr. Jones admits that he does not use an assistive device. But he submits that had the ALJ considered his application under former Listing 1.04, which does not impose such a requirement, he would have met the Listing and would have been found disabled.

The Fifth Circuit has explained that:

> To determine whether a regulation may be applied retroactively, (1) "a reviewing court ... examines whether the regulation clearly expresses whether it is to be applied retroactively," and, (2) "[i]f there is no clear expression as to retroactivity, the court then considers whether the regulation would have a retroactive effect."

Germain v. US Bank Nat'l Ass'n as Tr. for Morgan Stanley Mortg. Loan Tr. 2006-7, 920 F.3d 269, 274–75 (5th Cir. 2019) (quoting Perez Pimentel v. Mukasey, 530 F.3d 321, 326 (5th Cir. 2008)). As Mr. Jones points out, Congress may constitutionally enact legislation with a retroactive purpose, as long as the retroactive application "is supported by a legitimate legislative purpose furthered by rational means." Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 729 (1984). But here, the Commissioner does not claim that the application of the new listing to

pending applications is constitutionally retroactive. Indeed, there is no indication that Congress authorized retroactive rulemaking by the Social Security Administration. See Bril v. Kijakazi, No. 5:22-CV-00002-KDB, 2022 WL 3702916, at *4 (W.D.N.C. Aug. 26, 2022) (noting that the "Commissioner's rule-making authority does not expressly authorize 'retroactive rulemaking'" (quoting Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213 (1988)); see also Nat'l Min. Ass'n v. Dep't of Lab., 292 F.3d 849, 859 (D.C. Cir. 2002) ("An agency may not promulgate retroactive rules absent express congressional authority."). Instead, the Commissioner argues that the application of the new listing to Mr. Jones' case does not have retroactive effect at all.

A statute has retroactive effect when "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf v. USI Film Prod., 511 U.S. 244, 280 (1994). Courts apply the same standard to determine whether a regulation has retroactive effect. E.g., Germain v. US Bank Nat'l Ass'n as Tr. for Morgan Stanley Mortg. Loan Tr. 2006-7, 920 F.3d 269, 274–75 (5th Cir. 2019); Perez Pimentel v. Mukasey, 530 F.3d 321, 326 (5th Cir. 2008). "'[F]amiliar considerations of fair notice, reasonable reliance, and settled expectations' help guide the analysis." Lopez Ventura v. Sessions, 907 F.3d 306, 314 (5th Cir. 2018) (quoting Landgraf v. USI Film Prod., 511 U.S. at 270). When an intervening statute or regulation "authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." Landgraf , 511 U.S. at 273 (1994).

Courts that have considered new listings issued by the Social Security Administration have not been unified in their findings. Some hold that application of a new listing to any pending application does not have impermissible retroactive effects. E.g., Bril v. Kijakazi, No. 5:22-CV-00002-KDB, 2022 WL 3702916, at *4 (W.D.N.C. Aug. 26, 2022); Evans v. Kijakazi, No. 1:20-CV-453-JPK, 2022 WL 3700020, at *8 (N.D. Ind. Aug. 26, 2022); Grady v. Comm'r of Soc. Sec.,

No. 1:22-CV-00007-SLC, 2023 WL 2300512, at *3 (N.D. Ind. Mar. 1, 2023); McCavitt v. Kijakazi, 6 F.4th 692, 694 (7th Cir. 2021); Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 647 (6th Cir. 2006); Curran-Kicksey v. Barnhart, 315 F.3d 964, 967 (8th Cir. 2003). Others find that applying new listings to pending applications is impermissibly retroactive. E.g., Maines v. Colvin, 666 F. App'x 607, 608 (9th Cir. 2016); Cherry v. Barnhart, 327 F. Supp. 2d 1347, 1358–59 (N.D. Okla. 2004); Kokal v. Massanari, 163 F. Supp. 2d 1122, 1131 (N.D. Cal. 2001); Howard v. Berryhill, No. 3:16-CV-318-BN, 2017 WL 551666, at *6 (N.D. Tex. Feb. 10, 2017). Although the results—and sometimes even the analysis—differs, what is clear is that courts take a fact specific approach to the question.

In Bril, the Western District of North Carolina considered the same Listing amendments challenged by Mr. Jones here. 2022 WL 3702916. The claimant had filed his claim prior to April 2, 2021, and the hearing before the ALJ also occurred before April 2, 2021. Id. at *4. However, the ALJ issued a decision on May 5, 2021, and applied the new musculoskeletal Listings. Id. The court found that the application of the new listing was not impermissibly retroactive because it did not impair the claimant's rights, noting that "[a] recipient of public benefits has no substantive right that guarantees him continued receipt of those benefits." Id. The court also found that the amendment did not increase the claimant's liability for any past conduct or impose new duties. Id. Finally, the court found that the change did not interfere with the plaintiff's reasonable reliance on settled expectations, noting that there was "no indication that the [claimant] filed his claim or decided the content of his action 'based on how the agency determines whether [he] meets the statutory requirements for disability eligibility.'" Id. (quoting Combs, 459 F.3d at 646).

The Combs decision upon which the Bril court relied was issued by the Sixth Circuit, which had considered an amendment to the Listings that resulted in the deletion of obesity as a listed

impairment. 459 F.3d at 644 The regulatory change occurred after the first ALJ's decision denying her claim but before the Appeals Council decided her appeal of that decision. Id.  The Appeals Council vacated the denial of benefits and remanded for further consideration. Id.  The ALJ again denied the claim, and the claimant appealed. Id.  The Appeals Council again vacated and remanded to a different ALJ. Id.  at 645. The second ALJ denied the claim, the claimant appealed, and the Appeals Council denied review. Id.  The District Court on review granted summary judgment for the Commissioner, concluding among other things that the Agency acted properly in not applying the former obesity listing to the claim because it had been deleted prior to the hearing before the second ALJ who issued the final decision. Id.  In affirming this holding, the Sixth Circuit applied the Landgraf factors for determining whether a statute operates retroactively and found that the change of regulation did not. Id.  at 645-47. The court of appeals found that a change in the Agency's step three analysis of the listings "is more procedural than substantive in nature." Id.  at 647. "The ultimate criteria of disability eligibility are not changed. Instead, a presumption designed for administrative workability was changed to conform agency determinations more closely with the statutory requirements." Id.

Relying in part on Combs, a court in the Northern District of Indiana found that application of the new musculoskeletal listings on remand was not retroactive. Evans v. Kijakazi, No. 1:20-CV-453-JPK, 2022 WL 3700020, at *8 (N.D. Ind. Aug. 26, 2022). In Evans, the court found the ALJ had failed to properly assess the claimant's impairments under Listing 1.04 in effect at the time of the ALJ's decision and remanded the case. Evans v. Kijakazi, No. 1:20-CV-453-JPK, 2022 WL 3700020, at *3 (N.D. Ind. Aug. 26, 2022). During the course of the claimant's appeal to federal court, the new musculoskeletal listings went into effect and, according to those regulations, would be applied to any decision made after a court remands. Id.  at *7. The court declined to order the

ALJ to apply the old Listing 1.04 on remand, noting that it was persuaded by Combs. Id. at *8. The court further found that even if the change could be considered retroactive, it found no manifest injustice to the plaintiff. Id.  It observed that "[a]lthough the listing criteria have changed, the fundamental criteria for disability – inability to engage in substantial gainful activity because of an impairment that is expected to last for a continuous period of twelve months, 42 U.S.C. § 423(d)(1)(A) – have not changed." Id.  It added that the claimant would be found disabled if he ultimately met that criteria whether at step three or step five. Id.

Considering the same Listing amendment as the Combs court, a district court in Oklahoma reached a different result, holding that deletion of the obesity listing was a substantive change attaching new legal consequences to claimants who "acted" by filing their claims before the obesity Listing was removed. Cherry v. Barnhart, 327 F. Supp. 2d 1347, 1358–59 (N.D. Okla. 2004). Reaching the same result, a district court in California held that where the new regulations deleting the obesity Listing went into effect after the ALJ's decision but before the Appeal's Council's decision, it would be impermissibly retroactive to apply the new regulations to the claim. Kokal v. Massanari, 163 F. Supp. 2d 1122, 1132 (N.D. Cal. 2001). The court observed unfairness to the claimant who made her claim at a time when the obesity Listing was in effect. Id.  Although the obesity Listing remained in effect at the time of the ALJ's decision, the ALJ did not consider it and found the claimant not disabled. Id.  During her administrative appeal, the Listing was repealed and the Appeals Council did not consider either the old or new regulations in rejecting her appeal. Id.  The court observed that other similarly situated obese individuals who had their hearings while the obesity listing was in effect and whose ALJs properly considered the obesity Listing would have been granted disability benefits, while the claimant in Kokal had her claim for benefits denied due to the error of her ALJ in failing to consider the obesity Listing in effect at the time. Id.

The court has also found one case where a court held that old Listing 1.04(A) should have been applied. Pearson v. Comm'r, Soc. Sec. Admin., No. 1:22-CV-01013, 2023 WL 1457513, at *3 (W.D. Ark. Feb. 1, 2023). In Pearson, the claimant was applying for a closed period of disability from April 13, 2016, through March 1, 2021, because he returned to substantial gainful activity thereafter. Id. The court held that because plaintiff's final date of disability was before the April 4, 2021, effective date of the new musculoskeletal listings, the ALJ should consider whether the claimant met the criteria of the old listing. Id. The court did not engage in a "retroactive effect" analysis.

In one Ninth Circuit case, the Landgraf factors to determine retroactive effect were not considered and the court of appeals held that the ALJ should have considered the applicant's eligibility for benefits under the listings effective at the time of application absent express instruction from Congress to the contrary because the regulations provide that "[a] claimant's eligibility for benefits, once determined, is effective based on the date his or her application is filed." Maines v. Colvin, 666 F. App'x 607, 608 (9th Cir. 2016).

It does not appear the Fifth Circuit has articulated an opinion on whether the Social Security Administration may apply amended Listings to applications pending on the effective date of the amendment. Nonetheless, the case-specific results of the courts that have considered such questions of possible retroactivity indicate that there would be no general rule to apply. Here, the new musculoskeletal Listings went into effect after the state agency denied Mr. Jones' claim on reconsideration and after Mr. Jones filed his administrative appeal. However, the new Listings were in effect at the time of the hearing before the ALJ and at all times thereafter. And, at the time Mr. Jones filed his administrative appeal on February 23, 2021, the Agency had already announced

that the new regulations would become effective as to all applications pending as of April 2, 2021 (less than six weeks later).

Like the court in <u>Bril</u>, the Court finds that rights possessed by Mr. Jones when he acted would not be impaired by application of new Listing 1.15 to his application for benefits. In other contexts, courts have held that entitlement to social security benefits does "not to create a vested property right before adjudication or payment." <u>King v. Finch</u>, 428 F.2d 709, 714 (5th Cir. 1970); <u>Kyler v. Kijakazi</u>, No. 1:19-CV-03334 (CJN), 2022 WL 1165859, at *6 (D.D.C. Apr. 20, 2022 ("Disability benefits under the Social Security Act are non-vested benefits 'and do not become vested until one has actually established his eligibility.'" (quoting <u>Harris v. Richardson</u>, 468 F.2d 1260, 1260 (9th Cir. 1972)). Mr. Jones did not become disabled based on the regulations in existence at that time. Nor can it fairly be said that Mr. Jones filed his application in reliance on the regulations in existence at the time of filing.[1] It is not as if he might have filed his application at some other time had he known the new Listing would apply. Further, the new Listing has not increased Mr. Jones' liability for past conduct or imposed any new duties upon him. As the court in <u>Evans</u> aptly observed, although the Listing criteria may have changed, the fundamental statutory criteria for disability have not. 2022 WL 3700020, at *8. The Court concludes that applying the new musculoskeletal listings to Mr. Jones' application does not result in impressible retroactive effects.

The court has rejected the equal protection argument raised by Mr. Jones because it is based on a theory that there must be a rational basis for an explicitly retroactive statute, and here, the Court has found the regulation does not have a retroactive effect. Mr. Jones has presented no case

---

[1] At the time he filed his initial application in October 2019, the regulations provided that the musculoskeletal listings "will no longer be effective on [January 27, 2020] unless extended by the Commissioner or revised and promulgated again." 20 C.F.R. Subpt. P, App. 1, at 460 (Rev. as of Apr. 1, 2019). He could not reasonably have relied on the Listings in effect in 2019 continuing to be applicable through the duration of his application.

law to support finding an equal protection violation under circumstances similar to those here. There are no unusual circumstances here that might make application of the new Listings to Mr. Jones' claim unjust, such as in <u>Pearson</u>, 2023 WL 1457513, at *3, when the entire period of disability was before the new Listings went into effect, or in <u>Kokal</u>, 163 F. Supp. 2d at 1131, where the Listing in effect at the time of the ALJ's decision would have resulted in a finding of disability had the ALJ not erred in failing to consider the Listing in effect at the time of decision. Nor is there any basis to find that the Commissioner delayed the resolution of Mr. Jones' application in order to bring it within the ambit of the new Listing. The new Listing went into effect less than six weeks after Mr. Jones requested a hearing before the ALJ. Hearings are not typically set within such a short time period because the claimant's medical records must first be obtained. In sum, the Court finds no constitutional error in the Commissioner's application of musculoskeletal Listings that went into effect on April 2, 2021, to Mr. Jones' claim.

Mr. Jones also argues that the ALJ erred in failing explain why his impairments were not equivalent to old Listing 1.04 or new Listing 1.15. The court considers only Listing 1.15 for the reasons discussed above. The ALJ found that "no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." R. at 19. The ALJ explained further that in reaching this conclusion, he had considered the opinions of the State agency medical consultants. <u>Id.</u>

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." <u>Id.</u> at 531. As Mr. Jones points out, one of the

ways to meet equivalence is when a claimant has a Listed impairment and he "exhibit[s] all the findings, but one or more of the findings is not as severe as specified in the particular findings." 20 C.F.R. § 404.1526(b)(1)(i)(B). In that situation, the regulations provide that the impairment "is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria." Id. § 404.1526(b)(1)(ii).

Mr. Jones argues that he can meet Listing 1.15 even though he does not meet subpart D because he has four disc herniations affecting both his neck and lower back, producing nerve root impingement, and "marked" stenosis. He submits that he has both sensory and reflex loss, and that he has exhibited gait abnormalities, tenderness and muscle spasm, and has pathology involving his left shoulder that resulted in deficits affecting the use of his left arm and hand. But Mr. Jones fails to demonstrate how any of these symptoms and conditions medically equals a documented need for a walker, or an inability to use one upper extremity along with a documented medical need for a one-handed, hand-held assistive device, or an inability to use both upper extremities, as required by listing D. Indeed, the use of such a device reflects functional limitations in ambulation, but throughout the relevant period, Mr. Jones' physical therapist noted a functional gait. It was Mr. Jones' burden to establish that his impairments medically equal a listed impairment, and he has not done so. Substantial evidence supports the ALJ's conclusion that his impairments are not equivalent to Listing 1.15.

*Issue No. 2.    Whether the ALJ improperly failed to consider the effect of Mr. Jones' medical treatment on his ability to sustain gainful employment.*

Mr. Jones argues that the ALJ erred in failing to consider his medically necessary treatment including epidural injections, nerve blocks, a left shoulder surgery, and physical therapy on his ability to sustain employment. He submits that he would have to miss all or part of a workday at

least 38 times over 20 months since his disability onset date. He adds that once his physical therapy is complete, he will likely require 2 level lumbar and cervical fusions. He argues that all this would have a significant effect on his ability to sustain employment. Indeed, he points out that the vocational expert testified that a hypothetical person who had to miss all or part of a workday 38 times over 20 months would not be able to sustain employment.

The Commissioner opposes, arguing that substantial evidence supports the ALJ's findings. The Commissioner insists that the medical record does not establish that Mr. Jones had greater functional limitations beyond those specified by the ALJ. She notes that Mr. Jones went to physical therapy 38 times over a period of ten months (not 20 months), which the ALJ acknowledged. She argues that going to physical therapy frequently during a period of recovery or after surgery does not establish medical necessity of ongoing physical therapy at the same level of frequency on a permanent basis. The Commissioner argues that the ALJ considered Mr. Jones' treatment in assessing his residual functional capacity and argues that the residual functional capacity assessment is by its definition, a measure of the claimant's ability to work on a regular and continuing basis.

In reply, Mr. Jones argues that even though he only received physical therapy for a period of 10 months, before that he required surgery and injections that would also have required him to miss time. As a result, he argues, he can meet the 12-month duration requirement to establish disability.

The Fifth Circuit has held that "if an individual's medical treatment significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity." Newton v. Apfel, 209 F.3d 448, 459 (5th Cir. 2000). In Newton, there was evidence that the claimant's illness and

treatment occasionally caused her to sleep for several hours during the day. Id. She had been hospitalized several times due to systemic lupus erythematosus flare ups, had approximately nine-emergency room visits, and had numerous office visits. Id. The court ordered that on remand, the ALJ must consider the effect of the claimant's treatment on his ability to remain gainfully employed. Id. In the case upon which Newton relied, the claimant had to undergo medically prescribed traction for his back pain three to four times daily, which the court found would significantly interrupt a normal eight-hour workday. Epps v. Harris, 624 F.2d 1267, 1273 (5th Cir. 1980). In both Newton and Epps, the court of appeals found the ALJ's decision was not supported by substantial evidence for numerous reasons, not simply the failure to consider the effect of treatment.

Here, the Court finds substantial evidence supports the ALJ's findings. First, there is no indication from Mr. Jones' physical therapy record that such physical therapy would have interfered with his workday. Moreover, as the Commissioner points out, this physical therapy was for a limited period of less than 10 months. There is no suggestion that the physical therapy and surgery are constant treatment that affect Mr. Jones' ability to work on a sustained basis. The ALJ considered the record as a whole and assessed Mr. Jones' residual functional capacity, which, as the Commissioner points out, is a measure of the claimant's ability to work on a regular and continuing basis. The Court finds no error in the ALJ's failure to incorporate additional limitations related to Mr. Jones treatment.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 14) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 18 ) be GRANTED.

**OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 26th day of June, 2023.

Janis van Meerveld
United States Magistrate Judge